Chattanooga v. Railroad.

CITY OF CHATTANOOGA *v*. SOUTHERN RAILWAY CO.

(*Knoxville*.   September Term, 1913.)

1. **RAILROADS.   Street crossings.   Police power.**

Acts 1907, ch. 149, sec. 25, empowering a city to require, by ordinances, railroad companies to build, maintain, repair, or replace at their own expense such bridges and approaches over their tracks when crossing any streets as the council may deem necessary to the safety and convenience of travelers on the street, and an ordinance pursuant thereto are within the scope, and an exercise, of the police power.   (*Post, p.* 401.)

Acts cited and construed:   Acts 1907, ch. 149, sec. 25.

2. **CONSTITUTIONAL LAW.   Impairing obligation of contracts.**

The matter of proper crossings of streets and railroads for the safety and welfare of the public is one within the police power, future exercise of which cannot be bargained away by a city, so that Const. U. S., art. 1, sec. 10, forbidding passage of laws impairing obligation of contracts, is not contravened by Acts 1907, ch. 149, sec. 25, empowering a city, by ordinance, to require a railroad to build or replace, bridges over its tracks at street crossings, and an ordinance requiring the company to build a new bridge at such a crossing, though prior to the act, in consideration of contribution by the company to a bridge there built, the city contracted with it to forever after maintain a suitable bridge there.   (*Post, p.* 402.)

Cases cited and approved:   Chicago, etc., R. Co. v. People, 200 U. S., 561; Chicago, etc., R. Co. v. Nebraska, 170 U. S., 57; State, ex rel. Minneapolis, v. St. Paul, etc., R. Co., 98 Minn., 380; Northern Pacific R. Co. v. Minneapolis, ex rel. Duluth, 208 U. S., 583.

3. **RAILROADS.   Street and railroad crossings.   Power to require bridges.**

Under the common law a city could require a railroad to construct and maintain, at its expense, a proper bridge at a street crossing over its tracks.   (*Post, p.* 408.)

Chattanooga v. Railroad.

Cases cited and approved: Railroad v. State, 40 Tenn., 523; Dyer County v. Railway, 87 Tenn., 712; Railway v. State, 87 Tenn., 751.

FROM HAMILTON.

Appeal from Chancery Court, Hamilton County.—T. M. McConnell, Chancellor.

Bachman & Noll and Coleman & Frierson, for City of Chattanooga.

Cooke, Swaney & Hope, for Southern Railway Co.

Mr. Justice Williams delivered the opinion of the Court.

This suit, standing on bill of complaint of the city and cross bill of the railway company, was brought to determine whether the city or the company is liable for the cost of constructing a bridge over the track of the company on one of the streets of the city. The bridge, being deemed by both parties an urgent necessity, was constructed at a cost of $8,354.90, under an agreement that provided that each party should contribute one-half of the cost, and that neither should be precluded of its right later to recover of the other. The city sues for $4,177.45, and the company by its cross bill sues the city for a like sum.

The city predicates its right to recover on an ordinance duly passed pursuant to power conferred on it

Chattanooga v. Railroad.

by an act of the legislature (Acts 1907, ch. 149, sec. 25) "to require, by ordinance, railroad companies to build, maintain, repair, or replace, at their own expense, such bridges and approaches, . . . over their tracks when the same cross any of the streets of said city, as the general council may deem necessary to the safety and convenience of the public traveling on said streets," etc.

The bridge in question replaced an old wooden structure which had been erected in 1876, and, concededly, had become inadequate.

The company's defense, and also its right to recover under its cross bill, is, in the ultimate, based on a contract in reference to the construction of the old bridge; it being alleged that in 1876 its predecessor company had contributed $1,000 towards such construction under a contract, duly entered into, which provided that for that consideration the city should build and forever afterwards maintain a bridge at the crossing in question, sufficient and suitable to accommodate the travel at that and all future times. It is contended by the company that this contract was validly entered into, and that it cannot be affected by the statute and the pursuant ordinances, later passed, because of the provision of the constitution of the United States (article 1, sec. 10) forbidding the passage of laws impairing the obligation of contracts.

It is clear that the statute and ordinance touching such bridge were within the scope, and an exercise, of the police power of the State. Authorities subsequent.

128 Tenn. 26

But the company's contention is that, while this may be true generally, yet that the extension of the police power of the city by the legislative act could not operate to nullify the contract previously made, especially since the city does not purpose a change in the character of the crossing from an overhead structure to one not overhead.

The insistence of the city is that it was beyond the power of the board of mayor and aldermen of Chattanooga, in 1876, to so bargain or contract as to deprive future boards of the exercise of police power in relation to this subject-matter, thereafter conferred on the municipality by the State.

No court has gone further than the supreme court of the United States in giving to the police power a broad scope and application. *Chicago, etc., R. Co.* v. *People,* 200 U. S., 561, 26 Sup. Ct., 341, 50 L. Ed., 596, 4 Ann. Cas., 1175.

Recent decisions by that court appear to us to have construed the provision of the national constitution invoked by the company—forbidding the impairment of the obligation of contracts—in connection with the police power, in such way as to demonstrate the unsoundness of the company's contention.

In *Chicago, etc., R. Co.* v. *Nebraska,* 170 U. S., 57, 18 Sup. Ct., 513, 42 L. Ed., 948, it was held that contracts which affect the safety and welfare of the public are within the supervising power and control of the legislature when exercised under the police power to protect the public safety, and that the obligation of a con-

Chattanooga v. Railroad.

tract between a city and a railroad company to partici-
pate, in view of their mutual duty to the public, in
the construction of a viaduct over the company's tracks
is not violated or impaired by a statute and ordinance,
later passed, compelling the railroad alone to repair it.
The court, speaking first in respect of the contract to
participate in the construction of the viaduct, said:

"No doubt the agreement of 1886 constituted a con-
tract in such a sense that the respective parties thereto
continued to be bound by its provisions so long as the
legislation, in virtue of which it was entered into, re-
mained unchanged. While the agreement lasted, its
provisions defined the rights and duties of the city and
the railroad companies. But was it a contract whose
continuance and operation could not be affected or con-
trolled by subsequent legislation?

"Usually, where a contract, not contrary to public
policy, has been entered into between parties compe-
tent to contract, it is not within the power of either
party to withdraw from its terms without the consent
of the other, and the obligation of such a contract is
constitutionally protected from hostile legislation.
Where, however, the respective parties are not private
persons, dealing with matters and things in which the
public has no concern, but are persons or corporations
whose rights and powers were created for public pur-
poses by legislative acts, and where the subject-matter
of the contract is one which affects the safety and
welfare of the public, other principles apply. Con-
tracts of the latter description are held to be within

the supervising power and control of the legislature
when exercised to protect the public safely, health, and
morals, and that clause of the federal constitution
which protects contracts from legislative action cannot
in every case be successfully invoked. The presump-
tion is that, when such contracts are entered into, it is
with the knowledge that parties cannot, by making
agreements on subjects involving the rights of the pub-
lic, withdraw such subjects from the police power of the
legislature.

"We do not, indeed, understand that these prin-
ciples are questioned on behalf of the plaintiff in error.
What is claimed is that the subject-matter of the con-
tract in question does not fall within the range of the
police power of the State; . . . that, while it is not
questioned that the maintenance of the viaduct is es-
sential to the safety of the community, yet, if existing
contract obligations devolve this burden upon the city,
the legislature of the State cannot, under the plea of
public necessity, pass a law imposing it upon the plain-
tiff in error, without bringing the act within the pro-
hibitions of the federal constitution."

Continuing the discussion on the point pressed on us
in the case in hand, the court said:

"In view of the paramount duty of the legislature to
secure the safety of the community at an important
crossing within a populous city, it was and is within its
power to supervise, control, and change such agree-
ments as may be from time to time entered into be-
tween the city and the railroad company in respect to

such crossing, saving any rights previously vested. Any other view involves the proposition that it is competent for the city and the railroad company, by entering into an agreement between themselves, to withdraw the subject from the reach of the police power, and to substitute their views of the public necessities for those of the legislature.''

In *State, ex rel., Minneapolis* v. *St. Paul, etc., R. Co.,* 98 Minn., 380, 108 N. W., 261, 28 L. R. A. (N. S.), 298, 120 Am. St. Rep., 581, 8 Ann. Cas., 1047, there was involved a contract, entered into in 1892, by which the city of Minneapolis, in consideration of the railroad company constructing certain bridges and approaches at the intersection of stipulated streets, expressly agreed that the city would thereafter construct and maintain all crossings or approaches made necessary by the opening of new streets. It was contended by the railroad company that this constituted a valid contract with the city, and, having been complied with on the part of the company, that it was beyond the power of the city later to require the company to construct the bridge over a new street, in question; that to so require would be to impair the obligation of the contract. The court said:

''In this we do not concur. The power of the State to require the defendants to construct the bridge in question, or any other bridge at streets crossing the right of way is an exercise of the police power, which can be neither contracted away nor lost by inaction on the part of the public authorities. The contract was

beyond the authority of the city council, and *ultra vires,* and void''—citing *Chicago, etc., R. Co.* v. *Nebraska,* supra.

This Minnesota case was, by writ of error, taken to the supreme court of the United States, where it was affirmed (214 U. S., 497, 29 Sup. Ct., 698, 53 L. Ed., 1060), on the authority of the case of *Northern Pacific R. Co.* v. *Minnesota, ex rel., Duluth,* 208 U. S., 583, 28 Sup. Ct., 341, 52 L. Ed., 630.

This last-named case was a companion case to the Minneapolis case, and in it the opinion of the Minnesota court in the Minneapolis case was freely and approvingly quoted by the supreme court of the United States. Referring to rulings of the supreme court of Minnesota to the effect that it lay in the power of the city, at common law, at the time the contract was made with the company, to have required the latter to maintain in safety its crossings with both existing and future streets, and that any contract which undertook to limit the exercise of this right was without consideration, against public policy, and void, the court said, through Mr. Justice Day:

''This doctrine is entirely consistent with the principles decided by this court. But it is alleged that at the time this contract was made with the railroad company it was at least doubtful as to what the rights of the parties were, and that the contract was a legitimate compromise between the parties, which ought to be carried out. But the exercise of the police power cannot be limited by contract for reasons of public policy, nor

Chattanooga v. Railroad.

can it be destroyed by compromise, and it is immaterial upon what consideration the contract rests, it is beyond the authority of the State or the municipality to abrogate this power so necessary to the public safety." *Northern Pacific R. Co.* v. *Minnesota, ex rel., Duluth,* supra.

It was there again specifically ruled that the defense here urged of impairment of the obligation of a contract was not maintainable. The court well said that the police power is a continuing one, and that a requirement imposed on the company under it was "not in violation of the constitutional inhibition against the impairment of the obligation of contracts."

We are unable to distinguish the case at bar, in principle, from the Minneapolis case; and on its facts it is a counterpart of the Duluth case, where the contract was one under which the city and company shared the construction cost of an overhead bridge, and the city agreed that it would thereafter forever maintain and keep in repair the approaches thereto, and, for a period of fifteen years, the structure proper. Within the fifteen years the city demanded of the company that it repair the structure, and the litigation and rulings related thereto. 98 Minn., 429, 108 N. W., 269.

A fundamental contention of the company in this case is that in 1876 the duty of constructing and maintaining the old bridge was devolved by law on the city, and that the city had not power in law to compel the company to erect or maintain the bridge then constructed. If it be conceded that at that date there was

no statutory power in the city to that end, did it exist at the common law? This question is also discussed at length in the cases supra, decided by the supreme courts of Minnesota and the United States, where it was held that, by the great weight of authority, the city could enforce the construction and maintenance of such a structure as an obligation imposed on the company by the common law.

In this State as early as 1859 it was held, in *Railroad v. State,* 3 Head, 523, 75 Am. Dec., 778, that it was the duty of such a company to construct a suitable cross-ing, a bridge if necessary, "under the general prin-ciples of the common law." Our later case of *Dyer County* v. *Railway,* 87 Tenn., 712, 11 S. W., 943, is in accord, and further holds that the company's duty was a continuing one as to repair, and that case was cited by the supreme court of Minnesota in the Minneapolis case in support of its own holding. See, also, *Railway* v. *State,* 87 Tenn., 751, 11 S. W., 946.

It is clear that, if that right was then by the city deemed doubtful, and that, under doubt as to where to lay the paramount duty to construct and maintain the bridge, the contract was then entered into, in *quasi* compromise or truce, a later valid exercise of the police power did not work an impairment that was a violation of the constitutional provision invoked.

If it be conceived that the contract of 1876 was valid to an extent, still the contracting parties were charged with notice of the limitation of power on the part of the city in respect of its binding itself not to exercise in

Chattanooga v. Railroad.

after years a police power to onerate the company with the constructon and maintenance of a safer and more adequate bridge, demanded by changed conditions, mainly incident to the growth of the city.

The chancellor was not in error in so ruling; decree below affirmed, and the cause remanded for further proceedings in accord.