THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND STATE HIGHWAY COMMISSION, DEFENDANTS.

THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND STATE HIGHWAY COMMISSION, DEFENDANTS.

STATE HIGHWAY COMMISSION, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, DEFENDANTS.

Argued October 7, 1932—Decided January 26, 1934.

HEHER, J. (Dissenting.) I am unable to concur in the result reached by my associates.

The legislature, by chapter 319 of the laws of 1927 (*Pamph. L.* 1927, *p.* 712), established a state highway system, consisting of specified routes designated by number. These routes were not definitely located. It was provided that route No. 30 should extend from Trenton to Buttzville, "by way of Pennington, Ringoes, Flemington, Clinton, Washington and Buttzville," and route No. 31 from Princeton to Milford, New York, "by way of Somerville, Bedminster, Netcong, Newton, Lafayette, Hamburg, Vernon to a point in the vicinity of New Milford, New York."

The act further provided that the "routes shall be as short and direct as practicable between the points specified;" that "existing highways may be made use of wherever it is con-

venient so to do, but the commission (state highway commission) may lay out, open and improve new roads over acquired rights-of-way, and may also lay out routes in continuation of, connecting with, or in addition to the routes above specified;" and that "all sharp turns and angles and railroad grade crossings shall be eliminated wherever practicable."

The highway commission constructed roads over routes Nos. 30 and 31, except the necessary railroad crossings and approaches thereto. Pursuant to the mandate of chapter 88 of the laws of 1929 (*Pamph. L.* 1929, *p.* 138), the commission formulated, in advance of January 1st, 1930, a program for the location and construction of new crossings of railroads and state highways not at grade, for the year 1930, and included therein the construction of a bridge over the railroad on route No. 30 at Hampton, and a bridge carrying the railroad over route No. 31 at Raritan. Alleging that the railroad company had refused to enter into an agreement for the doing of work necessary to locate and construct the proposed new crossings, and to assume the payment of one-half of the cost thereof, and that a dispute had arisen in respect of its obligation in the premises, the commission presented petitions to the board of public utility commissioners, in two separate proceedings, submitting the disputed matters for determination, under the provisions of the act. *Pamph. L.* 1929, *p.* 138. Each petition prayed that an order be made approving the construction of the proposed crossing, and directing that the railroad company bear one-half the cost thereof.

The board found that the proposed crossings were not required by traffic conditions, or "any consideration of public safety." It concluded that the legislature had vested the execution of the state's highway policy solely in the highway commission, and that chapter 88 of the laws of 1929 imposed upon the railroad company the obligation to co-operate with the highway commission in the prompt execution of the work, when furnished with the program formulated by the commission, and to bear one-half the cost thereof, and that an order

of the board commanding the railroad company to co-operate with the highway commission, and to bear one-half the cost, would add nothing to the direct legislative mandate which fixes the obligation of the company in express terms. It therefore held: (1) that it was without authority to order the railroad company to co-operate with the highway commission in the construction of the crossings, and to bear one-half the cost of construction; (2) that it was without authority to restrain the highway commission from constructing the new crossing unless it assumed the entire cost; (3) that it had no authority to veto the location of the crossing as planned by the highway commission, and that its authority extended only to matters of construction; and (4) that the railroad company was not relieved of its obligation, because the proposed work was not actually begun or completed during the year 1930.

In the Raritan case, the board held that the crossing should be of the width planned by the highway commission, and the petition was denied, except in so far as it was determined that "if the crossing is to be constructed as located, the type and plan of crossing proposed by the commission is reasonable." In the Hampton case, the board found that a crossing roadway thirty feet in width is adequate. The petition was denied, except in so far as it was determined that "if the crossing is to be constructed as located, its construction as provided in finding fourteen is approved."

These writs bring up the board's determinations. Both parties complain of the result. The railroad company challenges the board's conclusion that its obligation to bear one-half the cost of the proposed crossings was fixed by statute, and that it was not relieved therefrom because the work was not started or completed during the year 1930; and maintains that, in any event, the imposition upon it of one-half the cost of the construction of the crossings, under the circumstances here existing, is unreasonable and arbitrary, and a deprivation of its property without due process of law. It insists that the board should have decided all matters in dispute in its favor, and that it "has a constitutional right to

have decided somewhere" the question of the alleged deprivation of its property without due process of law "by virtue of this attempted exercise of police power." It urges that the question be decided by this court "on a review of the evidence presented to the board." The highway commission contends that the board erred in refusing to make orders directing the railroad company to co-operate with it in the construction of the crossings, as planned, on the basis of an equal division of the cost as prescribed by the act of 1929.

The inquiry *in limine* is to ascertain the nature and extent of the railroad company's obligation in the premises. The highway commission affirms, and the railroad company denies, that the provision in the latter's charter, imposing upon it an obligation to construct crossings over or under its railroad, relates to highways laid out across the railroad after its construction, as well as to the public roads which existed at the time the railroad was built. The railroad company relies upon *West Jersey and Seashore Railroad Co.* v. *Woodbury,* 80 *N. J. Eq.* 412, and *Morris and Essex Railroad Co.* v. *Orange,* 63 *N. J. L.* 252. But the railroad company's obligation, in the instant case, does not depend upon its charter. It is imposed by statute, and such is a valid exercise of legislative power.

It is fundamental that the power to impose such a burden, to advance public safety and convenience, resides in the legislature. It is well settled that railroad corporations may be required, at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks, or to carry their tracks over such highways. *Chicago, Milwaukee and St. Paul Railroad Co.* v. *Minneapolis,* 232 *U. S.* 430; 34 *Sup. Ct.* 400; 58 *L. Ed.* 671; *Missouri, K. and T. Railroad Co.* v. *Oklahoma,* 271 *U. S.* 303, 307; 46 *Sup. Ct.* 517; 70 *L. Ed.* 957, 961; *Atchison, T. and S. F. Railroad Co.* v. *Railroad Commission,* 283 *U. S.* 380, 393; 51 *Sup. Ct.* 553; 75 *L. Ed.* 1128, 1138.

A railroad company receives its charter and franchise subject to the implied right of the state to establish and open

such streets and highways over and across its right of way as public convenience and necessity may, from time to time, require. That right on the part of the state attaches, by implication of law, to the franchise of the railroad company, and imposes upon it an obligation to construct and maintain, at its own expense, suitable crossings at new streets and highways to the same extent as required by the rules of the common law at streets and highways in existence when the railroad was constructed. *Chicago, Milwaukee and St. Paul Railroad Co.* v. *Minneapolis, supra; State, ex rel. Minneapolis* v. *St. Paul, M. and M. Railroad Co.,* 98 *Minn.* 380; 108 *N. W. Rep.* 261; 28 *L. R. A.* (*N. S.*) 298; *affirmed, St. Paul, M. and M. Railroad Co.* v. *Minnesota,* 214 *U. S.* 497; 29 *Sup. Ct.* 698; 53 *L. Ed.* 1060. In *Delaware, Lackawanna and Western Railroad Co.* v. *East Orange,* 41 *N. J. L.* 127; Mr. Justice Scudder said: "The public have, however, the right to lay roads over the railway tracks, and use them in crossing as part of such highways. In such use, all persons who pass over them, properly exercising the right to travel on the public highways, will be protected. * * * After the company have constructed their road, therefore, new obligations may be imposed upon them by new conditions arising after the road has been built, which do not relate to the construction but to the common use of highways by the railroad and by the public. * * * It is clear * * * that when the privilege is given to a railroad company to cross public highways then existing, or that may afterwards be laid, it is not exempted from the common law duty of taking reasonable care to enable the public to use the highways with safety; and where there is such duty, a corresponding right exists in the legislature to enforce its performance by appropriate legislation. * * * All these arrangements, by which burdens are put upon the company of a character different from any others in the charter, are necessary for the protection of the passengers and freight conveyed on the road as well as for the safety of the public. * * * Protection to the public is protection also to the corporation and to the persons and property for which it is responsible. It is evident that the legislature may thus require additional precau-

tions of railway companies, involving expense to them, to prevent injuries to persons and property within and without their cars, while exercising their franchises under their charter. Such requirements are in the nature of police regulations, and do not conflict with the constitution because they take away no vested rights, nor do they interfere with or impair the powers conferred on the company by the act of incorporation. The essential franchises of the corporation are not disturbed." This view has received the approval of the court of errors and appeals. *Morris and Essex Railroad Co.* v. *Orange,* 63 *N. J. L.* 252, 258; *Erie Railroad Co.* v. *Public Utility Commissioners,* 89 *Id.* 57, 84; *affirmed,* 90 *Id.* 672.

The power of the legislature to impose such burdens for general safety under the police power is fundamental. The exercise of such power does not impair any contract in the company's charter. Whether the corporation has an irrepealable contract in its charter or not is immaterial. Police powers are inherent in the government, and the legitimate exercise of legislative power in securing public safety does not impair the obligation of contracts, nor deprive anyone of property without due process of law. *Morris and Essex Railroad Co.* v. *Orange, supra.* As was said by Chief Justice Fuller, in *New York and New England Railroad Co.* v. *Bristol,* 151 *U. S.* 556, 567; 38 *L. Ed.* 269, 273: "The governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury." The exercise of the police power cannot be limited by contract for reasons of public policy. It is beyond the power of the state or the municipality to abrogate this power so necessary to public safety. *Northern Pacific Railroad Co.* v. *Minnesota,* 208 *U. S.* 583; 28 *Sup. Ct.* 341; 52 *L. Ed.* 630; *Chicago, Burlington and Quincy Railroad Co.* v. *Nebraska,* 170 *U. S.* 57; 18 *Sup. Ct.* 513; 42 *L. Ed.* 948.

The common law required the railroad, as to existing and future streets, to maintain them in safety, and to hold its

charter rights subject to the exercise of the legislative power in this behalf. Any contract which undertakes to limit the exercise of this right is without consideration, against public policy, and void. *Northern Pacific Railroad Co.* v. *Minnesota, supra.*

The question in each case is whether, in the light of the facts disclosed, the regulation is essentially an unreasonable one. *Atchison, T. and S. F. Railroad Co.* v. *Railroad Commission, supra; Norfolk and Western Railroad Co.* v. *Public Service Commission,* 265 *U. S.* 70; 44 *Sup. Ct.* 439; 68 *L. Ed.* 904.

But the railroad company insists that, under the circumstances here presented, the imposition upon it of one-half the cost of constructing the new crossings, is an unreasonable exercise of the police power. It is argued, first, that the evidence reasonably justifies the finding of the utility commission that considerations of public safety and convenience do not require the construction of the crossing; and, second, that "from those findings the conclusion of law necessarily follows in each case that the imposition upon the railroad of part of the cost of these crossings would be an unreasonable exercise of the police power."

I cannot agree. The contention of the railroad company, briefly stated, is this: It is unreasonable to require it to pay one-half the cost of constructing the Raritan crossing (the total cost of which, the board found, will be approximately $96,000, although the railroad company insists the cost will be $135,000), because that crossing will be within eight hundred feet of an undergrade crossing in Somerville, and within four thousand feet of another undergrade crossing in that municipality. These crossings were constructed by the railroad company in 1926, at a cost in excess of $2,000,000, in accordance with an order of the utility commission entered on December 30th, 1922, in a proceeding instituted by the highway commission. The present route is through Somerville, on Bridge and Somerset streets. These streets are, in the judgment of the highway commission, inadequate, because of width, turns and angles, to serve the purposes of a state

highway. The highway commission has laid out a section of this highway two miles in length, between the Raritan river and state highway route No. 29, on a new location and right of way, not only to by-pass the business and residential sections of Somerville, but to provide a direct connection between the part of the route extending from Princeton to Somerville, and the section extending from Somerville to Chester. As to the Hampton crossing, it is contended that traffic conditions do not require this additional crossing.

These proposed crossings will constitute part of the state highway system established by the act of 1927. They are to be constructed in pursuance of a definitely established policy, declared by the highway commission to promote public safety and convenience, to by-pass, in the location of its main arteries of traffic, the cities and centers of population, where traffic hazards are great and unimpeded movement is rarely possible. It has been the state's policy to develop a highway system adequate to meet its unusual traffic needs. Situated between New York and Philadelphia, its highways are in constant use by motor vehicles engaged in intrastate and interstate commerce. Its policy has been to provide roads that, in location, width and in every other particular, will permit of the expeditious movement of traffic, with a minimum of danger to its inhabitants and travelers upon its highways. It seeks to eliminate all unnecessary and avoidable traffic risks.

In the Hampton case, there are additional reasons for the construction of the new crossing. The proposed crossing will be part of a highway, located on a new right-of-way, which by-passes the town of Hampton. The existing road is narrow and extends through the town, where it is known as Main street. It continues under the railroad through an underpass twenty-five feet wide. North and south of the underpass there are sharp turns in the road. It descends from the south to the north for a distance of one thousand three hundred feet on a grade averaging eight per cent. This grade extends north of the railroad for a distance of eight hundred feet, and south for a distance of five hundred feet. The original clear-

ance of the underpass was twelve feet, but it has been reduced to eleven feet six inches as a result of the crowning of the roadway. It is conceded that the existing grade interferes with the movement of traffic. But it is denied that this presents "serious difficulties." It is also admitted that the clearance of the underpass is not sufficient, and that the curves present problems, but it is said that these difficulties can be "rectified with comparatively little expense."

I am unable, therefore, to find a basis for the conclusion that either of the proposed plans is unreasonable or arbitrary. There is no abuse of power. There is no confiscation of property. Each advances the public interest in a matter that is clearly the subject of the exercise of the police power.

The next question presented relates to the scope of the utility commission's jurisdiction. The legislature established a state highway system. The highway commission was empowered to lay out, open and improve new roads over acquired rights-of-way, and enjoined to make the specified routes "as short and direct as practicable between the points specified," and to eliminate "all sharp turns and angles and railroad grade crossings, * * * wherever practicable." It was provided that the width of the pavement shall be at least eighteen feet, and the total width of the roadway shall be at least thirty feet, "except at bridges, culverts, or grade crossings, where the width of the roadway shall be of such width or widths as the State Highway Commission may deem necessary and determine." *Pamph. L.* 1927, *pp.* 712, 721, 722.

The act of 1929 (*Pamph. L.* 1929, *p.* 138) requires the highway commission to formulate yearly, in advance of January 1st, a program for the elimination of railroad crossings at grade on state highways, the improvement, relocation and reconstruction of crossings of railroads and state highways not at grade, and the location and construction of new crossings of railroads and state highways not at grade, covering the work to be started or completed during the year, "the aggregate estimated cost of the work in such annual program to be not in excess of two million dollars." Section 2 makes it "the duty of every such railroad company to co-operate with

the state highway commission in the prompt execution and completion of the work." Section 3 provides that "the cost of the work shall be borne by the state and the railroad company involved in equal shares," and that the highway commission and railroad company may enter into an agreement "covering the work in the annual program on the basis of equal division of the cost." Section 7 provides that "any dispute arising hereunder may be submitted to the" utility commission for determination.

It is obvious, it seems to me, that these statutes vest in the highway commission a liberal discretion in the carrying out of the legislative purpose. The legislature established the highway system, and declared the policy. The execution of the policy so declared was committed to the highway commission. The utility commission is not given power to regulate, supervise, control or review the action of the highway commission in locating new roads or establishing new railroad crossings. The jurisdiction of the utility commission is wholly statutory. It is well settled that the powers of such commission are special and limited, and they can exercise only such authority as is legally conferred by express provisions of law, or such as is by fair implication and intendment incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the objects for which the commission was created, and that any reasonable doubt of the existence of any particular power in the commission should be resolved against the exercise of such power. *Siler* v. *Louisville and Nashville Railroad Co.*, 213 *U. S.* 175, 194; 29 *Sup. Ct.* 451; 53 *L. Ed.* 753; *Backus-Brooks Co.* v. *Northern Pacific Railway Co.*, 21 *Fed. Rep.* (*2d*) 4, 19.

· The authority to determine "any dispute arising hereunder" is necessarily limited to the incidental controversies that may arise from the highway commission's exercise of the power conferred by the statute, *i. e.*, disputes respecting the type, capacity and cost of crossing structures required to carry out the formulated program, the time when and conditions under which the work is to be done, and like matters that are merely

incidental to the doing of the work comprised in the formulated program.

The power of the utility commission to compel compliance by the railroad company with the program formulated by the highway commission, in accordance with the provisions of the statute, is hardly open to question. Section 17 (a) of the act creating the commission (*Pamph. L.* 1926, *p.* 239) provides that it shall have power, after hearing, upon notice, by order in writing, to require every public utility to "comply with the laws of the state and any municipal ordinance relating thereto. * * *" And the power of the utility commission to compel compliance with the provisions of chapter 88 of the laws of 1929, if not expressly conferred, is clearly implied. It plainly comprehends jurisdiction to compel co-operation with the highway commission "in the prompt execution and completion of the work" required for the consummation of a program formulated in accordance with the authority conferred by the act.

The claim of the railroad company that, as the work on the proposed crossings was neither started or completed during the year 1930, the utility commission should have dismissed the petitions, it seems to me, is without merit. It was the duty of the railroad company, under the statute, to co-operate with the highway commission in the prompt execution and completion of the work. This it did not do. Rather it challenged the power of the highway commission in the premises, and the validity of the exercise of the power granted by the statute. It cannot now be heard to say that, through its own failure to co-operate, in compliance with the mandate of the statute, the program formulated for the year 1930 has, by mere lapse of time, lost its vitality.

And I am of the opinion also that there was no error in the determination of the utility commission that the type and plan of the crossing at Raritan, as proposed by the highway commission, was reasonable. The controversy relates to the width of the roadway at the underpass, and the cost of construction. The question was whether the underpass should

be fifty-six feet wide, as proposed by the highway commission, or thirty feet wide, as proposed by the railroad company.

I have not found any basis in the evidence for the conclusion that the action of the highway commission, in this respect, is unreasonable or arbitrary. Chapter 319 of the laws of 1927 provides that the width of the roadway of bridges, culverts or grade crossings shall be such as the highway commission "may deem necessary and determine." The evidence lends no support to the claim that there was an abuse of the discretion vested in the highway commission. The point made as to the construction cost is also without substance. As was said by Chief Justice Hughes, in *Atchison T. and S. F. Railroad Co.* v. *Railroad Commission, supra:* "The expense involved in the plan adopted, when considered in relation to the importance of the interests affected and to be served, does not appear to be so large as to warrant the condemnation of the plan as unreasonable and beyond the authority of the state."