8009

## ATLANTIC COAST LINE R. R. v. RAILROAD COMMISSION.

1. Constitutional Law—Railroad Commission—Police Power—Railroads.—Under the Constitution and laws of this State the railroad commission has the power to refuse to permit one railroad to cross the tracks of another *at grade.* The legislature, under the police power, may prohibit such crossing.

2. Ibid.—Railroads—Railroad Commission.—A resolution of the railroad commission, giving one railroad the right to cross another with an interlocking switch, the plans for which to be submitted to and approved by the commission, gives the petitioner no vested rights before the switch system plans are submitted to and approved by the commission and such resolution may be rescinded at any time before approval of the plans; but even if the petitioner has acquired vested rights since the passage of the resolution that does not prevent the commission from rescinding it.

3. Ibid. — Railroads — Railroad Commission. — Where a petitioner appears before the railroad commission at a meeting called for the purpose of passing on the report of its engineer and considering the plans for a crossing switch and the question of whether the commission should consent at all to such crossing was again discussed, and while petitioner objected to such consideration, it did not make the point that it was taken by surprise or unprepared to meet that issue, or ask for more time or ask the Court to require the commission to give it a hearing or suggest that it could make any different or further showing, but has all the time insisted that that

issue had been passed on, it will not be heard to say it has not had a hearing and has thereby been deprived of its property without due process of law.

4. IBID.—IBID.—The record shows the plans for the crossing were considered and disapproved.

5. RAILROADS—RAILROAD COMMISSION—MANDAMUS.—Where the railroad commission has already considered and rejected plans for a crossing switch, this Court will not by mandamus require the commission to consider and pass on them where there is evidence to sustain their finding, as the Court has no authority or disposition to substitute its judgment and discretion for that of the commission.

Petition by the Atlantic Coast Line Railroad Company in the original jurisdiction of this Court for a writ of mandamus against B. L. Caughman, John G. Richards, Jr., and G. McD. Hampton, constituting the Railroad Commission for this State.

*Messrs P. A. Willcox* and *W. P. Pollock,* for petitioner.

*Messrs. Lyles & Lyles* and *W. F. Stevenson,* contra.

September 11, 1911. The opinion of the Court was delivered by

MR. JUSTICE HYDRICK. The petitioner prays for a writ of mandamus, directed to the railroad commission, requiring it to consider and approve its plans for a grade crossing of the tracks of the Seaboard Aid Line Railway at Front street in the town of Cheraw. The efforts of the petitioner to make this crossing have resulted in considerable litigation. 88 S. C. 464, 477, 480, 71 S. E. 34, 39, 40. For the sake of brevity, the two companies will be referred to as the A. C. L. and the S. A. L.

Section 2179, Code 1902, reads: "No railroad shall be constructed to cross another railroad at the same level therewith, or across navigable or tide waters, without the consent, in writing, of the railroad commissioners, and in such

manner as they shall prescribe. It shall be unlawful for any corporation proceeding to construct a branch or extension, or otherwise to take any proceedings contemplating a new crossing of one railroad with another, at the same level therewith, unless such crossing shall first have been approved, in writing, by the railroad commissioners, and the preliminary approval of any plan for such crossing shall always be made subject to revision by the commissioners. And the Court of Common Pleas shall have full equity jurisdiction, on information filed by the Attorney General, in case of any violation of the provisions of this section."

Upon the petition of the A. C. L., after notice to the S. A. L., and a hearing had, on September 14, 1910, the commission gave its consent to the crossing in the following order, dated September 22, 1910: "After due consideration, the consent of this commission is hereby given to the Atlantic Coast Line Railroad Company to cross the main line track of the Seaboard Air Line Railway on Front street in the town of Cheraw, S. C., with its track at grade: *Provided,* That said crossing be protected with an interlocking switch, and crossing to be subject to the approval of the commission: *And provided, further,* That all expenses incurred by said crossing be paid by the Atlantic Coast Line Railroad Company." It appears from the record, that, when this consent was given, none of the commissioners had personally examined the place of the proposed crossing. But, thereafter, on December 28, they held a meeting in Cheraw, in connection with this controversy, and while there, the S. A. L. petitioned for a rehearing on the matter of the commission giving its consent to the crossing, which was refused in the following order:

"(1) The petition of the Seaboard Air Line Company for a rehearing in this matter is dismissed.

"(2) The permission of the Atlantic Coast Line Railroad Company to cross track of the Seaboard Air Line Company on September 22d, 1910, contemplated the furnishing to

this commission of preliminary plans for an interlocking switch and crossing and the proper erection of the same, subject to the approval of this commission.

"(3) That all material necessary to the completion of the interlocking switch and crossing, as ordered, be assembled before any work on the same is begun, and that the work of erection be carried on to completion simultaneously.

"(4) That no engine or train be operated over said crossing until the same has beeen inspected by the official engineer of this commission and accepted by the commission."

From this order, one of the commissioners dissented, on the ground that his examination of the place that day had satisfied him that the crossing at Front street was and always would be too dangerous to the traveling public, and would interfere too much with the use by the S. A. L. of its main line, which objections could be materially lessened by a grade crossing at Second street, one block from Front street, or by an overhead crossing at Front street. On December 30, the A. C. L. notified the commission that it had assembled at Cheraw all the materials necessary to the completion of the interlocking plant and crossing, as authorized by the order of September 22d, and requested that the commission send its engineer to supervise its immediate placing. Accordingly, the commission sent an engineer, who made an examination of the materials assembled for the purpose of putting in the crossing, and a meeting of the commission was held on January 2d, for the purpose of hearing his report, and also for the purpose of considering the plans and ascertaining whether they came up to the standard which should be required for safety. Both roads were notified of the meeting and both were represented by their engineers and attorneys.

In the meantime, the personnel of the commission had been changed. The term of office of one of the commis-sioners, who had favored giving consent to the crossing, had expired, and his successor had qualified and taken his place

on the commission. This fact is mentioned merely to explain a change in the attitude of the commission with respect to the matter. At this hearing, on January 2d, a great deal of testimony was heard and discussion had as to whether the plans proposed made the crossing safe. The petitioner contended that the commission had given its consent to the crossing in its order of September 22d, and that that consent was final and irrevocable, and that all the commission could do, at that time, was to consider and approve or disapprove of the plans proposed by it. A majority of the commission, consisting of the new member and the member who dissented from the order of December 28th, overruled this contention, and held that the matter of consent was still open, and that the commission still had the right to inquire into the safety of the proposed crossing, and to withhold their consent, if they concluded that it would be unsafe. The new commissioner announced that he had not seen the place of the proposed crossing, and that, until he had, he could not intelligently decide whether the commission should consent to a grade crossing at that place, or whether the plans of the crossing proposed should be approved or disapproved. After having heard the evidence and arguments as to the sufficiency of the plans proposed, and after having inspected the place, he agreed with the commissioner who dissented from the order of December 28th, and they, being a majority of the commission, passed the following order, dated January 6, 1911:

1. "That this commission should not consent to the present plan of the crossing by the Atlantic Coast Line of the Seaboard Air Line on Front street, as the same is dangerous to the traveling public and detrimental to the public at large.

2. "That this commission should consent to a crossing of the Seaboard Air Line Railway by the Atlantic Coast Line Railway at Second street, under such plans as this commis-

sion will approve, and in the event that the Seaboard Air Line carries out the offer hereinbefore stated.

3. "That in the event the said Atlantic Coast Line Railroad Company shall not accept of said offer, but still insists on crossing the Seaboard Air Line at Front street, then that this commission shall not consent to any grade crossing, but require the said Atlantic Coast Line to cross the same on an overhead bridge, which the ground will admit of in a practical way, the plans of such overhead bridge to be approved by this commission."

From this order the other commissioner dissented, sustaining the position taken by petitioner, as above stated. Thereafter, on May 24, 1911, the petitioner herein filed a petition with the commission, requesting the commission to consider and approve the plans proposed by it, taking the position that the commission had not, at the hearing on January 2d, or at any time, considered and approved or disapproved its proposed plans for the crossing. The commission dismissed the petition, and this proceeding was commenced to compel the commission to consider and approve the plans proposed by petitioner.

The first contention of the petitioner is that, under the Constitution and statute, the commission has no power to deny one railroad the right to cross another at grade, where the fulfillment of its duty to the public by the road seeking to cross requires it; and that, in such cases, the power of the commission is limited to an approval of the manner of crossing. This contention is based upon section 6 of article IX of the Constitution, which reads: "Any railroad * * * organized under the laws of this State, shall have the right * * * to intersect with or cross any other railroad," etc. There are several sections of the Code which, in similar terms, give railroads the right to cross each other. But neither the section of the Constitution above quoted nor any statute gives one railroad the right, in so many words, to cross another *at grade,* and the right *to cross* does

not necessarily imply the right to cross *at grade.* On the contrary, section 2179, denies that right, except by consent of the commission, and then, only in such manner as it shall prescribe; and there is nothing in the provisions of that section in conflict with the section of the Constitution above cited. Notwithstanding that section of the Constitution, it would be perfectly competent for the legislature, in the exercise of the police power of the State, to prohibit grade crossings altogether, and require all existing grade crossings to be changed, and put above or below grade. *New York, etc., R. Co.* v. *Bristol,* 151 U. S. 556, 38 L. ed. 269; *Chicago, etc., R. Co.* v. *Nebraska,* 170 U. S. 57, 42 L. ed. 948; *Chicago, etc., R. Co.* v. *Illinois,* 200 U. S. 561, 50 L. ed. 596.

The next position taken by the petitioner is that the order of January 6th is void, first, because the order of September 22d, being a judgment or *quasi* judgment, was final and irrevocable; and, second, because the order of January 6th was made without giving the petitioner a hearing, after the petitioner had acquired vested rights, in reliance upon the order of September 22d, and it, therefore, operates to deprive petitioner of its property without due process of law. The fundamental error in this contention is in assuming that the commission ever gave its consent to the crossing. In *A. C. L.* v. *S. A. L.,* 88 S. C. 464, 71 S. E. 34, the Court held that the orders of September 22d and December 28th gave only "the preliminary approval of the commission to a crossing by the Coast Line at this point. Under very minute and substantial conditions, to wit, that the crossing was to be protected by an interlocking switch, and that all preliminary plans for the crossing and interlocking switch were to be submitted before the work was attempted." And it was distinctly held in that case that those orders gave petitioner "no absolute right to make the crossing." Under the terms of the statute, the petitioner's right to proceed was conditioned upon the consent of the commission. Until that consent was obtained,

it was unlawful for petitioner to institute condemnation proceedings for the purpose of acquiring rights of way, or to take any other step contemplating the making of such crossings. The law not only did not give the petitioner the right to make the crossing, without the consent of the commission, but positively forbade it. Therefore, neither the petitioner nor any others interested in the matter, had any right to take any steps in reliance upon the orders of September and December, because upon their face they were conditional, and it was not known whether the petitioner would be able to comply with the condition. Moreover, by the terms of the statute, even "the preliminary approval of any plans for such crossing shall always be made subject to revision by the commissioners." The legislature has imposed no restrictions upon the commission as to the terms and conditions upon which it will consent to such crossings. Therefore, it has the power to refuse its consent altogether, or to grant it upon such terms and conditions as it may see fit. And so long as it acts within the law and a reasonable discretion, it is subject to no control save that of the legislature. The condition upon which the consent of September 22d and December 28th was given was clearly within the law and the discretion of the commission, and it was a condition precedent, and no rights could vest or attach under the consent, until the condition had been fully complied with. In *A. C. L.* v. *S. A. L., supra,* the Court said: "No plans of an interlocking switch crossing were ever submitted to the railroad commission until January 2, 1911. Hence any attempt to put in the crossing previous to January 2, 1911, was a violation of the orders of the commission, and, inasmuch as the commission did not approve the plans submitted on January 2, 1911, but disapproved them, the attempt to put in the crossing thereafter was unauthorized by the commission." If the petitioner had no right to act upon the orders of September 22d and December 28th, and the Court expressly decided that it had not, it neces-

sarily follows that its contention, that it acquired vested rights in reliance upon those orders, cannot be sustained. But the truth is, and the record shows it, that petitioner acquired all the necessary rights of way, except across the S. A. L. tracks, before it ever applied for the consent of the commission to make the crossing, and if it has acquired any rights subsequent to the date of the orders giving a conditional consent to the crossing, the record fails to show what they are and when they were acquired.

But even if it be assumed that, acting in reliance upon those orders, the petitioner did acquire vested rights, it does not follow that the commission could not withdraw its consent to the crossing. The public safety is paramount to the vested rights of the citizen. The police power cannot be bartered away. In *Chicago, etc., R. C.* v. *Nebraska, supra,* Mr. Justice Shiras, speaking for the Court, said: "Usually, where a contract, not contrary to public policy, has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation. Where, however, the respective parties are not private persons, dealing with matters and things with which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject matter of the contract is one which affects the safety and welfare of the public, other principles apply. Contracts of the latter description are held to be within the supervising power and control of the legislature when exercised to protect the public safety, health and morals, and that clause of the Federal Constitution which protects contracts from legislative action cannot in every case be successfully invoked. The presumption is that when such contracts are entered into it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the pub-

lic, withdraw such subjects from the police power of the legislature." But, as we have seen, the petitioner knew, by the terms of the consent and by the terms of the statute, which provides that "the preliminary approval of any plans for such crossing shall always be made subject to revision by the commissioners," that it had no right to assume and act upon the assumption, that consent would finally be given.

The petitioner's next contention is that it has never had a hearing upon the right of the commission to revoke the consent given by the orders of September 22d and December 28th. It has been shown that no consent was given, and, therefore, there was no revocation, but merely a refusal to consent. But waiving that, the record shows that, at the meeting held on January 2d, which had been called to receive the report of the commission's engineer upon the plans proposed by the petitioner, a majority of the commission ruled, against the objection of the petitioner, and after repeated and extended arguments, that the question of the consent of the commission to the crossing was still an open matter, and that it had not been finally determined. The inquiry at that hearing was, therefore, not restricted to a consideration of the fitness of the proposed plans, but took the broader scope whether the commission should consent to a grade crossing at Front street at all, on account of the danger to the traveling public resulting from the peculiar physical conditions at that point, on account of the grade and curvature of the S. A. L. track. While petitioner strenuously objected to the consideration of that question, it did not make the point that it was taken by surprise, or was unprepared to meet that issue. No did it ask for further time to meet it, but it chose rather to rely upon its legal position that the orders of September 22d and December 28th giving consent were final. Nor has it been suggested that petitioner could or would have made any different showing, if the meeting had been called specifically for the purpose of considering the question of

consent.   Moreover, it will be noticed that petitioner has never asked the commission for a rehearing upon that point. Nor has it asked this Court to compel the commission to give it such a hearing, but it has at all times, since the order of September 22d, strenuously objected to any such hearing. Certainly, under such circumstances, it will not be heard to say that it has been deprived of its vested rights without a hearing.   But the truth is, the hearing on January 2d was quite as full on the question whether the commission should give its consent to the crossing, so far as the element of danger is concerned, and that is the only ground upon which consent was refused, as was the hearing which resulted in the order of September 22d.   Besides, the record shows that the new commissioner and the others had before them the evidence taken at the first hearing, which, as also appears from the record, was taken by one of the commissioners, in the absence of the others, and reported to the full body.   To meet the requirement of due process of law, it is not necessary that hearings before boards and commissions shall be conducted with the same formalities that characterize proceedings in Courts.

The next question is, has the commission considered the plans of the crossing proposed by the petitioner?   The record shows that the hearing of January 2d was devoted almost exclusively to the consideration of these plans, in connection with the question whether any plans could be devised which would afford adequate protection to the public for a grade crossing at Front street, and the decision of the commission shows they were considered and disapproved.

This issuance of the writ of mandamus is not a matter of strict legal right, but it rests in the sound discretion of the Court.   Nothing is better settled than that mandamus will not be issued to control the discretion or judgment vested by law in public officers.   If the commission had not already considered and rejected the plans proposed

by the petitioner, the Court could compel their considera-
tion by the commission. *Abbeville* v. *McMillan,* 52 S. C.,
60. (But it could not direct the result of that considera-
tion, unless the action of the commission with respect to the
matter was so clearly arbitrary and capricious as not to
admit of two reasonable opinions. *Mauldin* v. *Matthews,*
81 S. C. 414, 62 S. E. 695. The commission is invested by
law with the authority to decide the questions of fact in such
cases, and it is a body peculiarly fitted to decide such ques-
tions. Therefore, its decision of questions of fact, unless
wholly without evidence, is final and conclusive. Now, in
this case, the commission has found that the proposed cross-
ing is unsafe, and that no plans can be devised for a grade
crossing at Front street which will adequately protect the
public. It has also found that a grade crossing may be
made at Second street, which will be reasonably safe; and
that an overhead crossing at Front street is feasible. It has
also found that the proposed plan of crossing at Front street
is dangerous and should not be consented to, and that con-
clusion is not without evidence to support it. Even if the
Court did not concur in the findings of the commission,
nevertheless, it has no authority or disposition to substitute
its judgment and discretion for that of the commission.

Wherefore the petition is dismissed.

MR. CHIEF JUSTICE JONES *did not sit in this case.*