STATE OF NEBRASKA EX REL. CITY OF GRAND ISLAND, APPELLEE, V. UNION PACIFIC RAILROAD COMPANY, APPELLANT.

42 N. W. 2d 867

Filed June 8, 1950. No. 32729.

T. W. Bockes, C. B. Matthai, George C. Holdrege, R. B. Hamer, and Suhr, Pierce & Cronin, for appellant.

Harold A. Prince, E. Merle McDermott, and Walter P. Lauritsen, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

On February 1, 1949, relator authoritatively filed this action in mandamus to compel respondent railroad company, owning and operating its tracks across the city's streets, to construct an underpass or subway viaduct under such tracks, across Sycamore Street, as required by the provisions of section 16-656 et seq., R. S. 1943.

An order was entered on February 1, 1949, allowing an alternative writ of mandamus, which writ was issued and duly served on respondent, commanding it to commence construction in accordance with plans of the city then on file, showing the width, length, strength, and materials of such underpass and approaches thereto, or show cause on or before March 8, 1949, why it refused to do so.

On March 7, 1949, respondent filed its answer and return to the writ. On May 12, 1949, such return was amended, alleging substantially that Chapter 28, Laws 1949, effective April 30, 1949, repealed the provisions under which relator was proceeding, thus barring the action, and alleging further that the city's plans were not only insufficient but also that the action of the city council in passing an ordinance purporting to require and approve such plans was null and void because they were not "as required by the board of public works" as provided by section 16-657, R. S. 1943. Likewise, on May 12, 1949, relator amended its pleadings to traverse such amendments.

The cause was tried on the merits, and the trial court entered its decree on July 29, 1949, finding and adjudging the issues generally in favor of relator and against respondent and ordering issuance of a peremptory writ of mandamus, commanding respondent to commence on or before September 1, 1949, construction of the underpass proper and the approaches proper thereto, not to exceed 800 feet in length, in accordance with the city's plans, exhibit 28, received in evidence. As a matter of course, the word "proper" appearing after the words "underpass" and "approaches" modified each as an adjective, and was used only to distinguish the one from the other.

Respondent's motion for new trial was overruled, and in conformity with its own motion, issuance of a peremptory writ of mandamus was stayed, and the judgment was superseded. Thereafter respondent appealed to this

court, assigning substantially that the judgment was not sustained by the evidence and was contrary to law and the evidence. We conclude that the assignments have no merit.

The facts are primarily without dispute, except upon the respectively alleged sufficiency or insufficiency of the plans prepared by the city engineer respecting the width, height, strength, and materials of the proposed project, of which plans respondent concededly had notice at all times. A stipulation filed by the parties on May 16, 1949, and received in evidence at the trial admitted the procedure allegedly followed by the city, and acts done by it thereunder, as well as the history and topography of the city, and respondent's operative relation thereto. Primarily, the questions presented for decision involve the ultimate validity of the city's procedure, together with its actions thereunder, and the legal effect of Chapter 28, Laws 1949, effective after relator's right to compel construction had allegedly accrued, and it had incurred and paid obligations resulting therefrom, and after the filing of this mandamus action by relator, the issuance of an alternative writ, and the filing of respondent's return and answer thereto.

Section 16-656, R. S. 1943, provided: "Upon a majority vote of the citizens at a regular or special election of any city of the first class, the mayor and council shall have power to require any railroad company or companies, owning or operating any railroad track or tracks upon or across any public street or streets of the city, to erect, construct, reconstruct, complete, and keep in repair any subway viaduct or viaducts, upon or along such street or streets, and over or under such track or tracks, including the approaches to such subway viaduct or viaducts, as may be deemed and declared by the mayor and council necessary for the safety and protection of the public; *Provided,* the approaches to any such subway viaduct, which any railroad company or companies may be required to construct, reconstruct, and keep in repair,

shall not exceed for each viaduct a total distance of eight hundred feet."

Section 16-657, R. S. 1943, provided: "Whenever any such subway viaduct shall be deemed and declared by ordinance necessary for the safety and protection of the public, the mayor and council shall provide for appraising, assessing, and determining the damage, if any, which may be caused to any property by reason of the construction of any such subway viaduct and its approaches. The proceedings for such purpose shall be the same as provided herein for the purpose of determining damages to property owners by reason of the change of grade of a street, and such damage shall be paid by the city, and may be assessed by the city council against property benefited, and the cost of approaches beyond the distance of eight hundred feet may also be assessed by the council against property benefited by reason of the construction of any such subway viaduct and its approaches. The width, height, and strength of any such viaduct and the approaches thereto, and the material thereof, shall be as required by the board of public works, and as may be approved by the mayor and council."

Respondent conceded that relator complied with every provision of such statutes except the last sentence of section 16-657, R. S. 1943. The city conceded that it had no board of public works, but contended that the appointment of such a board was optional, not mandatory, as demonstrated by other related statutory provisions, in which event the mayor and council had authority to and did require and approve the width, length, strength, and materials of the proposed underpass.

In that connection we call attention to the fact that in the original act, Chapter 18, Laws 1901, § 118, p. 302, such last sentence read: "The width, height, and strength of any such viaducts and the approaches thereto, the material therefor, *and the manner of the construction thereof,* shall be as required by the board of public works, as may be approved by the mayor and council."

(Italics supplied.) It will be noted that the portion thereof italicized was eliminated from section 16-657, R. S. 1943, by Chapter 42, Laws 1919, § 1, p. 125, which act also, by amendment, included the duty of railroads to build subway viaducts or underpasses. As the statute now appears, it is evident that "the manner of the construction" of such an underpass was for determination by respondent and not relator.

Chapter 28, Laws 1949, effective April 30, 1949, did not abrogate the duty but generally changed the mode and manner of procedure for requiring the duty of railroads to construct viaducts over or subways under their tracks, in metropolitan and primary as well as cities of the first class, and provided for apportionment of the cost thereof between the railroad company or companies and the city. Section 17 of the act provided that nothing therein should modify, change, or abrogate any obligation of the railroad company or companies "to maintain, reconstruct, or keep in repair any viaduct or subway heretofore built or any replacement thereof under any agreement, statute, or ordinance previously in effect." Also, in the light of the fact that the act repealed parts of Chapter 14, article 3, Chapter 15, article 7, and Chapter 16, article 6, R. S. 1943, it provided in section 18: "Nothing in this act shall be construed to repeal or amend any statute except those statutes hereinafter specifically repealed, but shall be construed as independent, supplemental, and additional thereto, and as an independent act to provide the entire powers, facilities, and expenditures necessary to accomplish the elimination of grade crossings in the manner herein specified. No other statute shall be effectual as a limitation upon the powers or proceedings herein contained. Other statutes may be relied upon, if need be, to supplement and effectuate the purposes herein contained."

Neither in the title nor in the body of the repealing act was there any provision that the general saving clause, section 49-301, R. S. 1943, should not apply. That

section provides: "Whenever a statute shall be repealed, such repeal shall in no manner affect pending actions founded thereon, nor causes of action not in suit that accrued prior to any such repeal, except as may be provided in such repealing statute."

Respondent's contentions will be disposed of in the light of the foregoing preliminary statement, and the evidence adduced.

In that connection, an examination of the record discloses competent evidence sufficient to sustain the following:

Agents of respondent and its predecessors founded or laid out the original town of Grand Island on both sides of its right-of-way. Several streets in the original town were opened across respondent's tracks, and others were left closed. Grand Island is now a city of the first class, with a population of approximately 25,000, and is located on both sides of respondent's right-of-way. The major part of the business district is on the south side, but approximately two-thirds of the population live on the north side. Respondent's railroad tracks run generally east and west practically a block north of Third Street, the city's main business street. The main portion of the business district is located between Sycamore on the east and Elm on the west, both of which are open streets. The next street west of Sycamore is Pine, open across the tracks; then Wheeler and Locust, both closed; then Walnut, open; then Cedar, closed; and finally Elm, an open street. Because Wheeler and Locust Streets are closed, traffic from the north generally funnels into either the east or west end of the business district. Such traffic over Nebraska Highway No. 2, United States Highway No. 281, and city streets from the west generally funnels into the west end of the business district. Such traffic from the east and northeast generally funnels into the east end of the business district.

Respondent's passenger station is located approximately midway between Pine and Walnut Streets, and

its freight station is just east of Sycamore Street. In recent years almost every passenger train, when stopped at the station, has blocked either Pine or Walnut Streets, to say nothing of freight trains which are sometimes 100 cars in length, which even when moving take five minutes and more to clear the crossings, which are also consistently blocked by standing trains sometimes as long as 25 to 30 minutes at a time. Because thereof, teachers and children have been tardy at school, and traffic has been held up and deviated, while pedestrians at times crawled through between the freight cars.

Fourteen of respondent's tracks, counting both main line and switch facilities, cross Sycamore Street, over which admittedly an average of 24 passenger and 25 freight trains pass each day, exclusive of switch engines, as many as 15 to 31 of which crossed it every eight hours during a traffic survey made by relator. Such survey also disclosed that the number of motor vehicles and other such traffic passing over such tracks in eight hours was from 1,025 to 1,585, and the number of pedestrians from 282 to 380 during the same period. Two people have been killed and there have been several less serious accidents at the Sycamore Street crossing in recent years.

Contrary to respondent's contention, the necessity for an underpass for the safety and protection of the public, as deemed and declared by the mayor and council and alleged by relator, was amply supported by the evidence. An underpass at Eddy Street, 2,672 feet west of Sycamore Street, then under construction, could not logically be said to have alleviated that situation.

Early in the summer of 1947, the city authoritatively employed an engineer to prepare plans for the underpass. He obtained from respondent's engineers, who had theretofore constructed many, from 20 to 50, underpasses for respondent, the information which he required to design such an underpass. He then prepared plans which were filed with the city clerk on September 3, 1947, a copy of which was sent to respondent. Those plans disclosed

the required and approved length, width, height, strength, and materials for the underpass, and approaches thereto, by the use of drawings, words, figures, and recognized standard engineering symbols.

As early as September 26, 1947, the mayor entered into authoritative negotiations with respondent concerning construction of the underpass. By stipulation, respondent had full notice and knowledge of the city's plans at all times. As a matter of fact, it ultimately received five copies thereof, and a copy of the plans received in its office on October 3, 1947, is exhibit 28 received in evidence, from which, by the use of recognized engineering practices, respondent admittedly made detailed plans, blueprints, and work sheets, exhibit 34, received in evidence, sufficient to make a comprehensive estimate of the cost of construction. From the day respondent received the city's plans until this action was brought, it made no objection whatever to them. In the meantime, it did request information with regard to the water table, substrata, and relevant matters, which the city furnished without delay. Upon other occasions, relator offered to furnish any other information which respondent might deem necessary, but such information was never requested by respondent.

On February 26, 1948, the mayor and council passed an ordinance deeming and declaring the necessity for the underpass, calling for an election, and appointing a board of appraisers as provided by sections 16-656 and 16-657, R. S. 1943. On the same date they passed a resolution approving the plans and directing that a copy be filed with the city clerk for inspection by the public pending the election.

The appraisers took the oath, ascertained the damages to private property by reason of the proposed construction of the underpass, and made a report thereof to the council before election. The total damages so allowed were $59,500, of which amount $2,500 was paid on November 10, 1948, and $5,000 on December 16, 1948, or a

total of $7,500. No appeals were taken from damages allowed in three cases for the sum of $20,500, but appeals were taken in eight cases from allowances of a total of $31,500, which appeals are still pending.

The election was held on April 6, 1948, in the manner provided by law, without any objection by respondent, which election resulted in a vote of 4,640 for and 401 against requiring construction of the underpass. The votes were duly canvassed and the proposition declared carried by the mayor and council. Respondent was then notified of the result, whereupon it requested delay of construction until a later date.

On June 2, 1948, an ordinance was passed approving awards of the appraisers and appropriating money to pay such damages allowed by them.

On July 7, 1948, an ordinance was read the first time approving the city's plan for the width, height, strength, and materials of the underpass then on file with the city clerk, and requiring respondent to accordingly commence construction thereof not later than October 1, 1948. However, after first reading, such ordinance was laid over, with instructions for the city clerk to notify respondent's legal department that if they had any objections to the plans or any suggestions with regard to construction, they should present the same at the next meeting of the council on July 21, 1948.

On July 21, 1948, counsel for respondent appeared before the mayor and city council and requested postponement of construction until a later date. He then made no criticism or objections to the city's plans, and made no request for additional information. At that meeting the ordinance was read a second time, but the request made by respondent for postponement was referred to the street and alley committee for its consideration, and the council meeting was continued to August 4, 1948.

On August 4, 1948, the street and alley committee presented a report to the mayor and council recommending that respondent be given two months additional time to

commence construction. Thereupon, the ordinance was amended and passed by the mayor and council, giving respondent until December 1, 1948, and requiring it to commence construction on that date in conformity with such plans. At the same meeting, it appropriated the sum of $199,792.34 for payment of the city's estimated share of the cost of such construction.

On December 2, 1948, the city, at respondent's request, sent it detailed information with regard to the water table and substrata. Reply thereto was received on December 10, 1948, requesting further time to ascertain costs. However, three days preceding such reply, counsel for respondent wrote its chief engineer that it was respondent's intention to write the city "in further attempt to postpone a final showdown," and informed the engineer, "we must immediately prepare to defend litigation which may be commenced at any time." Therein, such engineer was directed to prepare "preliminary plans and estimate of costs * * * both as to an underpass and an overpass at this point" which "must be in enough detail to withstand cross-examination" since "The defense to such a suit must be founded in the contention that the city is acting in an arbitrary and unreasonable manner, and of course such an argument finds part of its foundation in the tremendous cost of the structures." Such a defense, however, was not presented in the case at bar.

Plans theretofore made by the city and forwarded to respondent were enclosed in that letter, from which engineers of respondent made detailed "preliminary plans and estimate of costs" as requested by its attorney. Thereafter, respondent made no attempt to commence construction, and this action was filed.

As early as Chicago, B. & Q. R. R. Co. v. State, 47 Neb. 549, 66 N. W. 624, 41 L. R. A. 481, 53 Am. S. R. 557, affirmed 170 U. S. 57, 18 S. Ct. 513, 42 L. Ed. 948, involving a similar statute, it was concluded that the statutory duty of a railroad company or companies to construct or repair viaducts within a city was enforceable by mandamus.

This court has also consistently adhered to the general rule that a mandamus proceeding is an action at law. State ex rel. Miller v. Lancaster County, 13 Neb. 223, 13 N. W. 212; State v. Affholder, 44 Neb. 497, 62 N. W. 871; State v. Farrington, 86 Neb. 653, 126 N. W. 91. In the light thereof, it was held in State ex rel. Lackey v. Gering & Ft. Laramie Irrigation District, 129 Neb. 48, 260 N. W. 568, followed in State ex rel. Heil v. Jakubowski, 151 Neb. 471, 38 N. W. 2d 26 that: "Finding of fact in a mandamus proceeding, based on conflicting evidence, will not be disturbed on appeal unless it is clearly wrong." As stated in another way, it was held in State ex rel. McMillin v. Boyd County, 130 Neb. 898, 266 N. W. 764, also a mandamus proceeding, that: "The findings of the trial judge on a question of fact in a law action will not be disturbed by this court when supported by competent evidence."

In that connection, the effect of the trial court's decree was to find, as a matter of fact, that the plans, exhibit 28, prepared by relator's engineer, sufficiently disclosed the width, height, strength, and materials of the underpass and approaches thereto, as approved and required by the mayor and city council. Contrary to respondent's contention, an examination of the record discloses that the trial court's finding in that regard was not only amply sustained by competent evidence adduced by relator, but was also supported by admissions made by respondent's witnesses with relation to its plans, exhibit 34, made from exhibit 28, both of which were offered in evidence by relator.

Respondent argued that the proceedings were fatally defective because relator had no board of public works, therefore no such board required the width, height, strength, and materials of the underpass as set forth in section 16-657, R. S. 1943. We conclude that the contention has no merit.

In the first place, the express power and authority to require respondent to erect, construct, reconstruct, com-

plete, and keep in repair such underpass was vested in the mayor and council and the electorate of the city by, section 16-656, R. S. 1943, which prescribed the conditions precedent necessary to exercise such power and authority. On the other hand, the manner of its construction was left with respondent, although the city, for the benefit of the public, was authorized by section 16-657, R. S. 1943, to require and approve not only the material of which it was to be constructed, such as wood, steel, or concrete, but also its width, height, and strength. The statute involved did not require the city to furnish the railroad company any plans as a condition precedent to the exercise of the power. In any event, the city did authoritatively furnish respondent sufficient plans. The trial court in effect so found, and we sustain that conclusion.

In In re Application of Rozgall, 147 Neb. 260, 23 N. W. 2d 85, this court said: "It has been aptly stated that 'In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.' 59 C. J., Statutes, § 594, p. 993. It has also been stated with authority that 'Provided always that the interpretation is reasonable and not in conflict with the legislative intent, it is a cardinal rule of construction of statutes that effect must be given, if possible, to the whole statute and every part thereof. To this end it is the duty of the court, so far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. Just as an interpretation which gives effect to the statute will be chosen instead of one which defeats it, so an interpretation which gives effect to the entire language will be selected as against one which does not.' 59 C. J., Statutes, § 595, p. 995. See, also, Drainage District No. 1 of Lincoln County v. Kirk-

patrick-Pettis Co., 140 Neb. 530, 300 N. W. 582."

The history of the statutes involved may be readily traced, and it will not be repeated here. It is sufficient to say that obviously, as provided by section 16-325, R. S. 1943, now section 16-325, R. S. Supp., 1949, section 16-253, R. S. 1943, section 16-320, R. S. 1943, and other related sections, the appointment of a board of public works by a city of the first class is entirely optional, and when such board is so established it is completely subordinate to the mayor and council, and required to perform only such duties in the manner and form as may be required and approved by the mayor and council, who in any event possess all legislatively delegated powers. In the absence of such a board the mayor and council, with assistance of the city engineer, have full power and authority.

The last sentence of section 16-657, R. S. 1943, provided: "The width, height, and strength of any such viaduct and the approaches thereto, and the material thereof, shall be as required by the board of public works, *and* as may be approved by the mayor and council." (Italics supplied.) If the appointment of a board of public works is optional, and we so hold, then the material part of the foregoing sentence should be and is construed to provide: shall be as required by the board of public works, *or* as may be approved by the mayor and council.

In that regard, it was held in State ex rel. Spillman v. Brictson Mfg. Co., 114 Neb. 341, 207 N. W. 664, 44 A. L. R. 1172: "Courts will, when necessary to effectuate the obvious intention of the legislature, construe conjunctive words as disjunctive." That rule has application and is controlling here. To hold otherwise would give validity to an absurdity which the Legislature never intended.

Respondent argued that there was a material variance between the command of the ordinance imposing the duty attempted to be enforced and the command of the

alternative writ, together with a further variance between both of such commands and that found in the judgment allowing the peremptory writ, which variance was allegedly fatal to relator's action. We conclude that the contention has no merit.

The basis for the contention was that the ordinance referred to plans then on file with the *city clerk*, while the alternative writ referred to plans then on file in the office of the *city engineer*, and that the judgment allowing and ordering issuance of a peremptory writ as prayed, commanded respondent "to commence the construction of the underpass proper and the approaches proper thereto, said approaches not to exceed 800 feet in length, in accordance with the plans introduced in evidence in this cause, Exhibit No. 28, on or before the first day of September, 1949."

In that connection, it will be noted that exhibit 28 was concededly the plans referred to in the ordinance, which plans concededly were and had been on file with the council and the city clerk since September 3, 1947, five copies of which had been at one time or another furnished respondent. No contention is or could be logically made that they were not the same plans.

Relator's petition, motion, and affidavit show exactly what plans were referred to, and referred to them specifically as having been filed in the office of the city clerk. Respondent, in its answer to the alternative writ, without objection to its form, admitted that such plans were prepared as alleged, and that the ordinance heretofore referred to was introduced and prepared as alleged. The entire case was tried upon the theory that exhibit 28 was such plans and no peremptory writ has ever been issued because it was stayed by respondents.

Doubtless, under the circumstances, the purported variance was at most a stenographic or clerical error, and immaterial. As stated in 38 C. J., Mandamus, § 712, p. 932: "However, even where this strict rule prevails, mere verbal and immaterial variances between the two

writs will be disregarded. * * * It is said that in those states where either by statute or by the prevailing rules of practice the right of amendment of pleadings has been extended to writs of mandamus, the practice now is to direct the mandate of the alternative writ to be so amended as to conform to the command of the peremptory writ."

Section 25-2164, R. R. S. 1943, specifically provides: "No other pleading or written allegation is allowed than the writ and answer. These are the pleadings in the case, and have the same effect and are to be construed and may be amended in the same manner as pleadings in a civil action; and the issues thereby joined must be tried, and the further proceedings thereon had in the same manner as in a civil action."

In that regard, it was said in State v. Karr, 64 Neb. 514, 90 N. W. 298: "No doubt the particular thing commanded by the peremptory writ must be found in 'a similar form' in the alternative writ; that is, nothing can be contained in the peremptory writ that is not embraced in the alternative writ. The liberal rules of amendments provided by the Code apply to this proceeding. If the relators are entitled to the thing commanded in the alternative writ, no doubt verbal inaccuracies in the writ might be amended to conform to the proofs." See, also, Kas v. State, 63 Neb. 581, 88 N. W. 776; Steidl v. State, 63 Neb. 695, 88 N. W. 853.

The foregoing rules control defendant's contention. Respondent was not actually misled to its prejudice in maintaining its defense to the material issues raised by relator's pleadings, which stated a cause of action. An amendment to the order for, or to the alternative writ itself, could not materially change respondent's defense already made as if so amended. Therefore, in conformity with section 25-852, R. R. S. 1943, they will be treated here as amended to conform to the proof, by changing the word "engineer" therein to "clerk"

with directions that the peremptory writ shall issue in conformity therewith.

There remains for decision respondent's primary contention that the enactment of Chapter 28, Laws 1949, effective April 30, 1949, was a bar to maintenance of this action. We conclude that the contention has no merit.

In that regard, the question of whether or not the Legislature had the power and authority to enact such legislation is not presented. We may assume for the purpose of argument only that it did have such power and authority. We may even assume for the purpose of argument only that it could have made such legislation operative retrospectively and could have provided that the general saving clause, section 49-301, R. S. 1943, should have no application. This is true because the act itself did neither the one nor the other.

This court only recently reaffirmed the rule that: "A legislative act will operate only prospectively and not retrospectively, unless the legislative intent and purpose that it should operate retrospectively is clearly disclosed." School District of Omaha v. Adams, 151 Neb. 741, 39 N. W. 2d 550. Neither the title nor the act itself, nor any other related statute contains any provision, express or implied, from which this court could conclude that the Legislature intended the act to operate either retrospectively or abrogate the general saving clause.

The general saving clause statute, section 49-301, R. S. 1943, was passed in 1873. See General Statutes of 1873, p. 1056.

Bennet v. Hargus, 1 Neb. 419, relied upon by respondent, was decided in 1859, but did not appear in the Nebraska Reports until 1871. Therein it was held that: "A right of action or remedy, founded solely upon a statute or a suit to enforce such remedy, not prosecuted to judgment, is determined by the repeal of the statute." That holding, however, as hereinafter ob-

served, was abrogated in all material respects by enactment of the general saving clause.

Globe Publishing Co. v. State Bank of Nebraska, 41 Neb. 175, 59 N. W. 683, 27 L. R. A. 854, decided in 1894, followed and reaffirmed Bennet v. Hargus, *supra*, in spite of and without mentioning the general saving clause statute then in full force and effect.

Thereafter followed Kleckner v. Turk, 45 Neb. 176, 63 N. W. 469; Thompson v. West, 59 Neb. 677, 82 N. W. 13, 49 L. R. A. 337; and Hanscom v. Meyer, 61 Neb. 798, 86 N. W. 381, all of which took cognizance of, discussed, and applied the general saving clause statute.

The last-cited opinion, after quoting such statute, said: "The repealing act of the sections mentioned is general in its terms and contains nothing to indicate any legislative intent other than that the general section governing repeals, just quoted, should apply with the same force it possesses in relation to any other repealed statute. A general saving clause regarding repealed statutes is by the authorities held to apply as though it was expressly incorporated in the repealing act, and this view of its effect has heretofore been announced by this court in the case of Kleckner v. Turk, 45 Nebr., 176, 195, where it is observed * * *: 'The general saving clause of our statute would have saved all actions pending under the provisions of the sections repealed, or causes of action not in suit, that accrued prior to the passage of the repealing act, if it had not been expressed in or clearly shown by the statute of 1891, which repealed sections 136 and 139, that it was not the purpose of the legislature that such pending actions and those accrued, but not in suit, should be preserved,' citing Gilleland v. Schuyler, 9 Kan., 569; State v. Boyle, 10 Kan., 113. Sutherland on Statutory Construction states the rule as follows: 'The legislature has the power to pass a general saving statute, which shall have the force and effect to save rights and remedies, except where the repealing statute itself shows that it was not the in-

tention of the legislature that such rights and remedies should be saved. Though one legislature cannot bind future legislatures, and each can make its laws prevail against any that exist, and its intention in that regard will be law; yet, as all legislatures are presumed to proceed with a knowledge of existing laws, they may properly be deemed to legislate with general provisions of such a nature in view.' Sutherland, Statutory Construction, sec. 226, and cases cited. In section 167 it is observed by the same author: 'The effect of repeal upon inchoate rights, upon offenses and upon incomplete proceedings may be avoided by a saving clause providing that it shall not affect such rights, prosecutions for such offenses, or such proceedings, or by a general statute for that purpose. Such general statutes have been enacted in nearly all of the states as well as by congress.' In Thompson v. West, 59 Nebr., 677, recently decided in this court, it is held first: 'In the absence of a general saving clause, the repeal of a statute will not affect a suit previously brought to enforce a right founded thereon or accrued thereunder.' "

In Lower v. State, 109 Neb. 590, 191 N. W. 674, this court said: "However, we do not find it necessary to decide that question in view of the provisions \* \* \* cited by the attorney general, commonly known as the 'general saving clause act.' " The opinion then quoted such statute, and said: "The same question that is before us arose in Michigan where a criminal statute was repealed, as in the present case, without an express saving clause. But that state has a general saving clause statute similar to ours, and, as in our statute, the word 'actions' is used without any qualifying words. The court there held that if the legislature did not intend that the word 'actions' should be used in its broad sense, so as to include both civil and criminal actions, it would have used other restrictive expressions, such as 'civil actions' or 'actions for damages,' and that, having failed to do so, it plainly appeared that it was the legislative

intention to include both civil and criminal actions within the purview of the statute. In re Adler, 171 Mich. 263.

"The word 'actions,' in a legal sense, has been defined as 'a judicial proceeding for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense.' Webster's New International Dictionary.

"It will, of course, be presumed that the legislature knew that section 3097 (now section 49-301, R. S. 1943) was and had been a part of the substantive law of the state almost 50 years when the 1921 act was adopted. It goes without saying that, if it had not been for the general saving clause statute, the legislature would in all probability have incorporated such a clause in the new act when the section in question was repealed."

In State ex rel. Spillman v. Security State Bank, 116 Neb. 223, 216 N. W. 803, this court said: "Further, section 39, ch. 191, Laws 1923, involved in this case, was repealed, without a saving clause, by section 18, ch. 30, Laws 1925, which became effective April 1st of that year. However, such repeal did not affect the matters involved herein, as section 3097, Comp. St. 1922 (which section took effect February 21, 1873, after Bennet v. Hargus, 1 Neb. 419, was decided) provides: * * *." The opinion then quoted the statute, and said: "This section was construed by us in Lower v. State, 109 Neb. 590, wherein we gave it a *literal* interpretation. It follows that our holding in Globe Publishing Co. v. State Bank of Nebraska, 41 Neb. 175, filed June 6, 1894, in so far as the same conflicts with our conclusion herein, and with Lower v. State, *supra,* is overruled." (Italics supplied.) See, also, Arnold v. Hawley, 128 Neb. 766, 260 N. W. 284.

City of Fremont v. Dodge County, 130 Neb. 856, 266 N. W. 771, and City of Beatrice v. Gage County, 130 Neb. 850, 266 N. W. 777, relied upon by respondent, are not controlling here. The title of Chapter 88, Laws 1935, p. 284, the act involved in those cases, read in part: "to provide that the general saving clause of

the statutes of Nebraska, Section 49-301, Compiled Statutes of Nebraska, 1929, shall not apply to this act; to repeal said original section, and to declare an emergency."

The body of such act also read in part: "Provided, further, that the general saving clause of the statutes of Nebraska, Section 49-301, Compiled Statutes of Nebraska, 1929, shall not apply to preserve to any municipality or governmental subdivision any right which such municipality or governmental subdivision may have had or claimed with respect to said moneys collected in counties under township organization as a county road levy and which have not heretofore been paid to such municipality or governmental subdivision, and provided further that the provisions of this section as amended shall take effect from and after its passage and approval, and shall be held and taken to apply to any case now pending and in which judgment has not become final in a court of last resort and to any case hereafter brought in any court in this state."

The primary question raised and affirmatively answered in those two cases was whether or not legislation so providing was constitutional. The act involved in the case at bar contained no such provisions. Therefore, as heretofore observed, the question presented here is not what the Legislature could lawfully do but rather what it did do.

The opinion in City of Beatrice v. Gage County, *supra,* at page 854, cited and quoted from Bennet v. Hargus, *supra,* simply to illustrate the applicable rule and conclusion to be reached in those cases wherein no comprehensive saving clause appeared in the repealing act itself, and there was no general saving clause statute existent, or by analogy, wherein there was such a statute, but the repealing act itself expressly provided that a general saving clause statute such as our own should not apply.

Insofar as applicable here, section 49-301, R. S. 1943, is all-inclusive and thus controlling. Relator's rights and cause of action matured and accrued, and this action was

brought and pending long before Chapter 28, Laws 1949, was enacted repealing sections 16-656 and 16-657, R. S. 1943. There was no express abrogation therein of the general saving clause and the repeal without such abrogation did not affect the case at bar. State ex rel. Cleveland Ry. Co. v. Atkinson, 138 Ohio St. 157, 34 N. E. 2d 233; Lincoln County v. Oneida County, 80 Wis. 267, 50 N. W. 344.

People ex rel. City of Buffalo v. New York Central & Hudson River R. R. Co., 156 N. Y. 570, 51 N. E. 312, parallels the case at bar upon the foregoing question presented. There is a difference in the wording of the two general saving clause statutes, but in all material respects one is as all-inclusive as the other upon all future legislation. Relator therein brought mandamus against respondent under the provisions of an 1853 act to require respondent to cause a street to be taken across its tracks. While that action was pending, the Legislature repealed the statute. Respondent contended that such repeal barred the proceeding because there was no saving clause in the repealing act. Relator argued, as in the case at bar, that by virtue of the general saving clause statute the act of 1853 was not repealed but continued in full force and effect so far as that proceeding was concerned. The court sustained that contention, saying: "These provisions are general in character and apply to all future legislation."

Thereafter, in People ex rel. City of Niagara Falls v. New York Central & Hudson River R. R. Co., 158 N. Y. 410, 53 N. E. 166, dealing with a converse situation, the court said: "We held in People ex rel. City of Buffalo v. New York Central & Hudson R. R. R. Co., (156 N. Y. 570) that the effect of the provisions of section 31 of the Statutory Construction Law (Laws of 1892, chap. 677) is to preserve a proceeding pending in a court to compel a railroad to take a street across its tracks after the preliminary steps have been taken as provided by chapter 62 of the Laws of 1853, notwithstanding the re-

peal of such act by chapter 754 of the Laws of 1897. In that case the city of Buffalo had not only acquired the right to compel the railroad to take a street across its tracks, but it had also instituted proceedings by mandamus to effectuate that result before the act of 1897 went into operation, and the right to prosecute a proceeding thus commenced to final effect, notwithstanding the repeal of the statute authorizing it, is preserved by the section of the Statutory Construction Law to which we have referred.

"This case presents an entirely different situation; for when the act of 1897 took effect, this relator had not instituted a proceeding by mandamus to compel defendants to carry the street over its tracks; indeed, it had not even acquired the right to institute such a proceeding."

In the light of the foregoing, this court will not by judicial interpretation conclude that the Legislature intended in the act involved to abrogate the operation of section 49-301, R. S. 1943.

Respondent argued that sections 17 and 18 of Chapter 28, Laws 1949, were special saving clauses which nullified or made inoperative the general saving clause by reason of the construction doctrine of expressio unius est exclusio alterius.

We conclude that the contention has no merit because sections 17 and 18 were not saving clauses in any sense as generally understood. A saving clause is a restriction in a repealing act, which is legislatively intended to save "pending actions founded" on the statute repealed, and "causes of action not in suit that accrued prior to any such repeal." § 49-301, R. S. 1943.

On the other hand, as stated in 59 C. J., Statutes, § 638, p. 1087: "A proviso is a clause engrafted on a preceding enactment for the purpose of restraining or modifying the enacting clause, or of excepting something from its operation which otherwise would have been within it, or of excluding some possible ground of misinterpretation of it, as by extending it to cases not

intended by the legislature to be brought within its purview. The proviso is generally introduced by the word 'provided,' but its existence and effect are to be determined rather by its matter and substance than by its form; * * *."

Section 17, and section 18 as well, upon which respondent relies, were simply special provisos and nothing more. We must assume that the Legislature was familiar with the purposes and provisions of the general saving clause statute. Admittedly, as disclosed by respondent's reply brief, the Legislature knew about the situation in Grand Island, and the pendency of this litigation, yet it passed the act without any mention of the general saving clause statute. The legislative intent is clear. This court cannot abrogate the general saving clause statute by judicial fiat.

Other propositions of law presented in the briefs require no discussion.

For the reasons heretofore stated, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.